In the Matter of PENN CENTRAL TRANSPORTATION COMPANY, Debtor.

Re proposed settlement with loan trustees (PENNSYLVANIA TUNNEL & TERMINAL CO.)

No. 70–347.

United States District Court, E. D. Pennsylvania.

Jan. 23, 1973.

John Wallace, Philadelphia, Pa., for trustees, Penn Cent. Transp. Co.

David Berger, P. A., by David Berger, Michael K. Simon, and Leonard Barrack, Philadelphia, Pa., for Penn Cent. Co.

Gratz, Tate, Spiegel, Ervin & Ruthrauff, by Wilbur B. Ruthrauff, Philadelphia, Pa., for Richard Joyce Smith, trustee, N. Y., New Haven & Hartford R. Co.

Davis, Palk & Wardwell, by Dale L. Matschullat, and Harvey A. Goldman, New York City, for Morgan Guaranty Trust Co. of N. Y., as indenture trustee.

Debevoise, Plimpton, Lyons & Gates, by Michael Patterson, and Robert Geniesse, New York City, for Provident Nat. Bank and A. Wakelee Swartz, Jr., loan trustees.

Ballard, Spahr, Andrews & Ingersoll, by Richardson Blair, Philadelphia, Pa., for Girard Trust Bank.

Fox, Rothschild, O'Brien & Frankel, by Nochem S. Winnet, Philadelphia, Pa., for First Nat. City Bank of New York.

## MEMORANDUM AND ORDER NO. 1082

FULLAM, District Judge.

The Debtor owns all of the common stock of the Pennsylvania Tunnel and Terminal Company ("PT&T"). In 1928, PT&T leased all of its properties to the Debtor for a term of 999 years. As rental under this lease, the Debtor was required to pay, *inter alia*, sums sufficient to meet the carrying charges on PT&T's indebtedness (including future indebtedness approved by the Debtor).

In 1965, to refinance some of PT&T's indebtedness and to finance improvements to the property, the PT&T properties were mortgaged for $50 million. The Debtor consented to the mortgage, guaranteed its payment, subordinated its lease to the mortgage, and assigned to the mortgage indenture trustees ("loan trustees") rentals payable to the Debtor from certain sub-leases of the property (the "station leases").

Under the terms of the assignment, which was consented to by the tenants, the Debtor was entitled to continue to collect the rents under the station leases in the absence of default under the terms of the mortgage loan, but in the event of default, the rentals were to be paid directly to the loan trustees.

The Debtor's filing for reorganization under § 77 of the Bankruptcy Act arguably constituted an event of default; at any rate, it seems clear that the mortgage is now in default (as of January 1, 1973, accrued interest aggregating approximately $6,768,200, and overdue principal payments aggregating $3 million, remained unpaid).

Shortly after reorganization, the loan trustees asserted the right to collect rents under the station leases. The Debtor resisted this claim. Pursuant to Order No. 15, the rentals collected under the station leases have been held in escrow, pending resolution of the underlying dispute. As of January 1, 1973, approximately $5,702,900 had accumulated in the escrow account.

As further security for the obligations of PT&T, and of the debtor as guarantor, the Debtor pledged with the loan trustees 902,690 shares of common stock of the Madison Square Garden Corporation, pursuant to a pledge agreement

dated December 31, 1968. The Debtor also owns 135,403 shares of Madison Square Garden stock not encumbered by the pledge, and 7,500 shares are held in the Debtor's contingent compensation fund. In a related aspect of the present petition, scheduled for final hearing on February 5, 1973, the Trustees are seeking authorization to dispose of all of their holdings in Madison Square Garden.

The Trustees now seek approval of a proposed compromise settlement with the loan trustees. Under the terms of the proposed settlement, rentals under the station leases held in escrow on September 30, 1971, or otherwise payable for periods prior to that date, will be divided equally between the loan trustees and the Trustees of the Debtor. Rentals accruing thereafter will be divided, 35% to the Trustees and 65% to the loan trustees. The loan trustees will consent to the sale of the pledged stock, and the proceeds from any sales of the pledged stock will be divided equally between the Trustees and the loan trustees. All sums payable to the loan trustees will be credited against the indebtedness of the Debtor's estate to the loan trustees, but the precise allocation as between principal, interest, and expenses will remain open for future determination.

Implementation of the proposed settlement would make immediately available to the Trustees approximately $2.4 million in cash, plus approximately $650,000 annually during the balance of the reorganization period. In the event the Madison Square Garden stock is sold, the Trustees would also obtain one-half of the proceeds from the pledged stock. In view of the precarious cash position of the Debtor's estate, these are indeed substantial advantages.

The proposed settlement is opposed by certain indenture trustees, on the basis of three lines of argument:

1. On the merits, the indenture trustees argue that the loan trustees have no right to sequester the income from the station leases, and that this Court's Opinion and Order No. 974 in connection with the sale of Park Avenue properties constitutes binding precedent to that effect. In short, the argument is that the Trustees should litigate the underlying dispute, and stand a good chance of winning. Were it not for the Trustees' pressing need for cash, this argument might well be acceptable. But as a practical matter (a) the Park Avenue sales order is the subject of a pending appeal to the Third Circuit; (b) the Trustees are faced with an arrangement negotiated by the Debtor in possession, before the Trustees were appointed, which has resulted in the deposit of the rentals in escrow; a present decision by this Court in favor of the Trustees' argument would not necessarily provide immediate access to the cash; and (c) the rights of the loan trustees in the present situation are not necessarily the same as the rights of the indenture trustees in the Park Avenue situation (here, there was a separate assignment of the rents, consented to by the tenants).

Under any view of the matter, it is clear that there is a valid dispute, and that the trustees' desire to achieve an immediate settlement of the dispute is not unreasonable.

2. It is argued that the reasonableness of the present proposal cannot be determined until the Trustees decide whether to affirm or reject the PT&T lease. If, in the final analysis, the PT&T lease is found to be burdensome, the Trustees will presumably reject it, in which case they will have been operating the property for the account of the lessor. The indenture trustees argue that the escrowed rentals should be held intact, so as to be available to meet "chargebacks" by the Trustees for deficit operations. (It appears to be conceded that this argument would have no validity if the Trustees should decide to affirm the PT&T lease.)

■ Section 77 plainly contemplates that leases and other executory agreements which have been adopted by the Trustees in the course of the reorganization proceedings may nevertheless be

disaffirmed in the final reorganization plan. The possibility of such ultimate rejection of a lease is not generally regarded as a bar to interim affirmances, or to the payment of rentals during reorganization pursuant to such interim affirmances. What the Trustees presently propose falls far short of affirmance of the PT&T lease, and preserves to the Trustees a greater degree of flexibility in determining their future course of action than would be the case if they were to affirm even on an interim basis. Since the Debtor guaranteed PT&T's indebtedness, the payment to the loan trustees under the proposed settlement would inure to the benefit of the Debtor's estate by reducing the amount of the secured claims against it. While it is true that "chargeback" claims against the lessor would presumably have a higher priority vis-a-vis the lessor's estate than would the claim of the loan trustees, it seems inconceivable that deficit operations of the lessor's lines could be permitted to continue to the point of erosion at which this difference in levels would be meaningful.

The indenture trustees are undoubtedly correct in suggesting that the issues would be more clear-cut if the question of affirmance or rejection of the PT&T lease could now be definitively resolved. The fact is, however, that the required segregation studies have apparently not been completed, and that various extraneous conditions which would have an important bearing on this decision have not yet solidified. In view of these uncertainties, the Trustees are not now in a position to affirm the lease. By the same token, however, it would be improvident to jeopardize the viability of a wholly-owned subsidiary by a premature decision to reject the lease. Under present circumstances, it is in the best interests of all concerned to leave the issue of affirmance or rejection unresolved.

On balance, however, I do not believe that these uncertainties provide a proper basis for rejecting a settlement proposal which has definite present advantages, and, in the long run, no probable future disadvantages.

3. Finally, the indenture trustees argue that the proposed settlement unduly favors one group of secured creditors. But the only favoritism is that the loan trustees will be receiving part payment of their undoubtedly valid claims, in advance of the formulation of a reorganization plan. The argument assumes that the Trustees' claim to the station rents is totally valid, and the loan trustees' claim to these rents totally invalid. For the reasons set forth above, I am persuaded that the present proposal represents a reasonable compromise of this dispute. If that premise is correct, then there can be no "undue favoritism" in the present transaction. It is clear, of course, that what amounts to surrendering a valid pledge of one-half of the Madison Square Garden stock represents an adequate contribution to administration expenses, so that the other secured creditors have no grounds for complaint on that score.

For all of the foregoing reasons, an order will be entered approving the proposed settlement.

## ORDER NO. 1082

## APPROVING A SETTLEMENT WITH THE TRUSTEES OF THE 4.9% SECURED NOTES DUE 1991 OF PENNSYLVANIA TUNNEL AND TERMINAL RAILROAD COMPANY

And now, this 23rd day of January, 1973, upon consideration of the Petition of the Trustees for Approval of a Settlement with the Trustees of the 4.9% Secured Notes due 1991 of Pennsylvania Tunnel and Terminal Railroad Company, and upon hearing duly noticed, this Court FINDS that implementation of the settlement referred to in the Petition is in the best interests of the Debtor's estate and its ultimate reorganization.

It is therefore ordered:

1. The settlement set forth in the Agreement attached as Exhibit A to the

Petition (the Agreement) between the Trustees and Provident National Bank, as corporate Trustee, and A. Wakelee Swartz, Jr., as individual Trustee (together, the Loan Trustees), under the Trust Agreement dated December 1, 1964 among Pennsylvania Tunnel and Terminal Railroad Company (PT&T), the Debtor and the Loan Trustees is hereby approved.

2. The sums paid into the special account with the Philadelphia National Bank (the Escrow Agent) established pursuant to Order No. 15 of this Court, entitled "The Philadelphia National Bank Escrow Agent for Penn Central Transportation Company, Debtor, Executor Account Madison Square Garden Rental per Court Order No. 15 Dated 7/16/70" (the Escrow Account) on or prior to September 30, 1971, together with interest thereon to the date of the distribution thereof, shall be divided equally between the Trustees and the Loan Trustees, and the sums paid into the Escrow Account subsequent to September 30, 1971, together with interest thereon to the date of the distribution thereof, shall be divided between the Trustees and the Loan Trustees in the respective percentages of 35% and 65%, and the Escrow Agent is hereby authorized and directed forthwith to pay all such sums to the Trustees and to the Loan Trustees as provided in the Agreement.

3. All rentals payable under two leases dated October 18, 1963 from the Debtor (the Station Leases), and any rentals payable as a result of any renegotiation of either of the Station Leases or upon any reletting of any of the properties covered by the Station Leases, on and after January 1, 1973 until the final confirmation of a plan of reorganization (after exhaustion of all rights of judicial review), or until termination of other final proceedings for the winding-up of the affairs of the Debtor (after exhaustion of all rights of judicial review), shall be divided between, and paid directly to the Trustees and the Loan Trustees in the respective percentages of 35% and 65%, and Madison Square Garden Center, Inc. (Center), as lessee under the Station Leases, and the joint venture composed of Two Pennsylvania Plaza, Inc., Tishman Plaza, Inc. and Pennsylvania Terminal Real Estate Corporation (the Joint Venture), as lessee under a sublease dated September 9, 1965 from Center of a portion of the station properties (Center and the Joint Venture being hereinafter referred to as the Lessees), are hereby authorized and directed to pay all such rent to the Trustees and the Loan Trustees as provided in the Agreement until they shall have been properly notified of such final confirmation or termination, and the Lessees shall have no further liability for the rent paid in accordance herewith, *provided*, that in the event that any Additional Rent (as such term is defined in the Station Leases) shall hereafter be paid by the Lessees for any period ending on or prior to September 30, 1971, such Additional Rent shall be divided equally between, and paid by the Lessees directly to, the Trustees and the Loan Trustees. In the event that any rental payment referred to in this paragraph 3 shall become payable prior to the date of distribution provided for in paragraph 2 of this Order, the Lessees are hereby authorized and directed to pay such sums to the Escrow Agent, and the Escrow Agent is hereby authorized and directed to add such sums to the Escrow Account and to distribute such sums, together with interest thereon to the date of distribution, to the Trustees and the Loan Trustees, in the respective percentages referred to in this paragraph 3, on the date of distribution referred to in paragraph 2 of this Order.

4. The Trustees are hereby authorized and directed to cause to be paid into the Escrow Account all proceeds (net of commissions) from any sales of the Pledged Stock pursuant to Order of this Court, and all such proceeds (together with interest thereon, if any) in the Escrow Account on each January 1,

April 1, July 1 and October 1, and on the latest date referred to in the first sentence of paragraph 3 of this Order, shall be divided equally between and paid by the Escrow Agent to the Trustees and the Loan Trustees on such dates, *provided* that no such payment shall be made prior to the date of distribution referred to in paragraph 2 of this Order.

5. The payments to the Trustees and the Loan Trustees pursuant to this Order and the Agreement shall be deemed final and binding dispositions of such sums. Except as provided in the preceding sentence, the effect of the payments to the Trustees and the Loan Trustees on the value of the security provided for in the Loan Instruments (as defined in the Agreement) and the nature of the credit to be accorded the payments to the Loan Trustees against their claims (that is, whether and in what proportion to be charged against principal, interest or expenses) are left to future adjudication in the plan of reorganization, final proceedings for the winding-up of the affairs of the Debtor, or other appropriate proceeding. Except as provided herein with respect to the amounts to be paid to the Trustees and the Loan Trustees, nothing contained in this Order shall in any way prejudice any rights or claims the parties hereto may have with respect to the Station Leases and the rentals and other amounts payable thereunder after the termination of the Agreement, including any claim with respect to the jurisdiction of this Court to deal with the Station Leases and rentals and other amounts thereunder.

6. In the event the Trustees should adopt the 999-Year Lease, dated June 14, 1928, as amended, from PT&T, as lessor, to the Debtor, as lessee, such adoption shall in no way affect the right of the Loan Trustees to receive the amounts payable to them pursuant to the Agreement and this Order, *provided* that the obligations to PT&T so adopted by the Trustees shall be reduced in an amount equal to such payments.

7. In the event that any portion of the rentals payable to the Loan Trustees pursuant to paragraph 4 of this Order shall for any reason not be paid by the Lessees when due, the Trustees shall cause to be paid to the Loan Trustees 65% of any amounts (less any costs of collection allocable to such amounts) recovered by them in lieu of such unpaid rentals, whether through damages or otherwise.

8. All payments to the Loan Trustees pursuant to this Order shall be free and clear of all liens and encumbrances including, without limitation, the lien of Trustees' Certificates issued pursuant to Order No. 124 of this Court, In re Penn Central Transportation Company, D.C., 325 F.Supp. 294.

9. Order No. 15 and all other Orders of this Court heretofore entered in these proceedings shall be deemed modified and amended to the extent that they may be inconsistent with this Order.

10. The Trustees and the Loan Trustees and their designees are hereby authorized and directed to take all such further action as may be necessary or appropriate to implement the Settlement.

11. It is hereby ordered and adjudged that an appeal without a stay of this Order shall not affect the right and duty of the parties to the Agreement to carry out the terms of the Agreement and this Order and the Trustees and the Loan Trustees are hereby directed forthwith so to do.